<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RUTH ANN MALLOY,<br><br>               Plaintiff,<br><br>v.<br><br>INTERCALL, INC., JOHN DOES (1-10) and<br>ABC CORP. (1-10),<br><br>               Defendant(s). | Civil Action No.: 08-01182 (JLL)<br><br><br>**OPINION** |

**LINARES**, District Judge.

This matter comes before the Court on: (1) a motion for partial summary judgment filed by Plaintiff Ruth Ann Malloy; (2) a motion to strike Plaintiff's expert Peter Crain, Ph.D, filed by Defendant Intercall, Inc. ("Intercall"); (3) a motion to strike Plaintiff's expert Stephen Levison, Ph.D, filed by Intercall and (4) a motion for summary judgment filed Intercall. The Court has considered the submissions in support of and in opposition to the motions and decides the matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons discussed below, Ms. Malloy's motion for partial summary judgment is denied, Intercall's motion for summary judgment is granted, and Intercall's motions to strike Ms. Malloy's experts are denied as moot.

**I.     BACKGROUND**

Prior to 2005, Ms. Malloy worked in the Wayne, New Jersey, sales office of ECI, a telephone and video conferencing company. (Pl.'s Stmt. of Undisputed Mat'l Facts in Supp. of

Mot. for Partial Summ. J. [hereinafter "Malloy's SOF"] ¶ 11.)  She had worked at ECI since

1994.  (Id.)  At the beginning of 2005, ECI was bought by Intercall.  (Id. ¶ 13.)  Thus, as of this

acquisition date, Ms. Malloy technically worked for Intercall.  But, until August 1, 2005, Ms.

Malloy continued reporting to her ECI supervisor, Greg Mills.  (Decl. of Serene M.Hennion,

Esq. in Opp'n to Def.'s Mot. for Summ. J. [hereinafter "Hennion Decl."], Ex. G., Dep. of Jay

McCarthy, dated Nov. 5, 2009, Tr. 78:14-23.

        As part of its process to determine which ECI employees it wanted to retain, Intercall

managers interviewed former ECI employees.  (Malloy's SOF ¶ 17; Def.'s Responsive Stmt. of

Mat'l Facts and Supplemental Stmt. of Facts Not in Dispute [hereinafter "Intercall's RSOF"] ¶

17.)  Ms. Malloy was interviewed in Intercall's Wayne, New Jersey office by Marty Dunne and

Kim McLachlan.  (Malloy's SOF ¶ 15.)   At the time of the interview, Mr. Dunne was Intercall's

Vice President of Sales and Ms. McLachlan was a sales manager.  (Id. ¶ 16.)  Ms. McLachlan in

turn supervised another sales manager, Patti Paczkowski.  (Id. ¶ 19.)   Intercall "terminated most

of the ECI sales representatives," but decided that it wished to retain Ms. Malloy as a sales

manager.  (Id.; Intercall's RSOF ¶ 19.)  Ms. Malloy was to continue working in Wayne, New

Jersey, and would be reporting to Ms. Paczkowski.  (Intercall's RSOF ¶ 19.)

        On July 13, 2005, Ms. Malloy emailed Ms. Paczkowski regarding her "impressions . . . of

the scope of [her] position within the Intercall organization in general and under [Ms.

Paczkowski's] direction in particular."  (Cert. of Gary J. Chester, Esq., in Supp. of Pl.'s Mot. for

Partial Summ. J. [hereafter "Chester Cert."], Ex. F, email from Ms. Malloy to Ms. Paczkowski,

dated July 13, 2005.)  Ms. Packowski responded to the email by providing responses in bold to

the queries posed by Ms. Malloy.  The questions and answers are as follows:

1. Ability to keep existing base of business. **YES.**
2. Ability to keep working existing prospects base for future close. **We will choose 10-15 of your top prospects. In addition, you will also be assigned a designated territory.**
3. Ability to retain my office in Wayne, NJ. **YES.**
4. Report to Patti Paczkowski and to report to the Parsippany Office for weekly status meetings (Thursdays). When traveling on business or during inclement weather in the winter I can call into the weekly status meeting. **YES. You will need to change your schedule a bit however . . . .**
5. While I work from home from 7:30 to 8:30 am, I will be into the office at 9 am and unless workload warrents (sic) it will leave at 5PM. **YES…our hours are 8:00-5:00 . . . .**
6. I will be permitted to continue to work as a Senior National Sales Manager . . . **. Your new title will be Senior Meeting Consultant.**
7. I have applied under West's career application. **Thank you!**
8. My salary and compensation will remain the same. **YES.**
9. Certain accounts such as ABA/ABACLE; and Southern Company's will be reviewed for possible relief. **We will review. Unable to commit on relief possibilities at this time.**

If there's anything I forgot please advise as to your consent to the above.

(Id.)  This arrangement—allowing Ms. Malloy to keep her existing accounts which were spread throughout the country—was not in line with Intercall's business model.  Intercall's businesses model provided that accounts should be serviced in the geographic region where the company being serviced is located.  (Malloy's SOF ¶ 50; Intercall's Stmt. of Facts Not in Dispute [hereinafter "Intercall's SOF"] ¶ 4.)  Ms. Malloy understood that her arrangement would be an exception to the general policy.  (Malloy's SOF ¶ 50.)

As part of her continuing employment with Intercall, Ms. Malloy received Intercall's policy manual.  (Decl. of Amy Dashiell and Vol. 1 of Exs. in Supp. of Def.'s Reply to Pl.'s Add'l Disputed Mat'l Facts [hereinafter "Dashiell Decl."], Ex. A, Malloy Dep., dated Apr. 6, 2009, Tr. 346:16-347:24; Intercall's RSOF ¶ 26.)  She testified that she read the manual "front to back." (Malloy Dep. Tr. 347:25-348:8.)  In particular, Ms. Malloy acknowledges that her

employment at Intercall was at-will.  (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. [hereinafter "Malloy Opp'n"], at 43 ("Plaintiff is an at-will employee.")

On August 1, 2005, Ms. Malloy stopped reporting to Mr. Mills and started reporting to Ms. Paczkowski.  Although Intercall in general agreed to allow Ms. Malloy to keep her existing client base, some of her accounts were transferred to other locations.  For example, prior to September 2005, Wellpoint, Sony and PMI were transferred to the national accounts office or to the offices in the geographic region where those companies are located.  (Dashiell Decl., Ex. A., Malloy Dep. Tr. 208:22-209:4; Br. in Supp. of Def.'s Mot. for Summ. J. [hereinafter "Intercall's Summ. J. Br."], at 16 & n.8.)  Then, on October 13, 2005, Mr. Dunne sent an email to Ms. Paczkowski and Ms. McLachlan regarding Ms. Malloy's accounts.  He stated:

> Guys . . . let's agree that by Jan 1, [Plaintiff] should begin transitioning her acquisition activity that is outside of her designated territory to local MCs.  Does that make sense?  If not, where does it not makes sense?  Thoughts.

(Chester Cert., Ex. H, email from Mr. Dunne, dated Oct. 13, 2005.)  Ms. Paczkowski responded:

> I agree that the majority of her accounts should be moved locally to the appropriate territory.  I agree that this makes most sense for the company.
>
> However, the problem is that we committed in writing to keep all existing accounts under [Plaintiff].  She has called me out several times already regarding this commitment.  To transition these accounts will guarantee her departure.
>
> At this point, I am trying to decipher if her leaving would be best OR if her leaving would guarantee a huge loss in revenue based on her existing client relationships. (She has lead me to believe that this is the case.)
>
> Marty [Dunne], please allow me to November 15th before committing to [transfer her accounts].

(Id.)  Mr. Dunne responded: "Okay."   (Id.)  Although Mr. Dunne testified that he wanted Ms. Malloy's accounts transitioned before January of 2006 because of his belief that they would be

"better managed by local representatives" (Malloy's SOF ¶ 41), it is undisputed that Ms.

Malloy's accounts were not transferred at that time.

Also in October of 2005, Intercall acquired other companies including Sprint

Conferencing and Raindance Conferencing.  (Intercall's Reply to Pl.'s Add'l Disputed Mat'l

Facts [hereinafter "Intercall's Reply SOF"] ¶ 4.)  Ms. Paczkowski did not assign any accounts

from these acquisitions to Ms. Malloy.  (Id.)  However, it is undisputed that "other sales

consultants who reported to Paczkowski received accounts from the acquisitions."  (Id.)  It is

also undisputed that all of the other sales consultant who reported to Ms. Paczkowski were

younger than Ms. Malloy.  (Id. ¶ 5.)  Ms. Malloy complained to Ms. Paczkowski about not being

assigned any of the new accounts.   Ms. Paczkowski replied:

> [I]n respect to the ECI and Sprint accounts, you have one of the largest revenue
> bases in the office. I held back transferring over new revenue to you based on how
> much responsibility you already manage. [T]his revenue would be considered as
> "moved" not "new," so as a result your quota would have increased even more.

(Id. ¶ 6; Intercall's SOF ¶67.)

On November 2, 2005, Ms. Malloy provided her October revenue numbers to Ms.

Paczkowski.  (Intercall's RSOF ¶ 59) .  Ms. Pazckowski responded by email that she was

concerned about the numbers because it appeared that Ms. Malloy would not be meeting her

targets.  (Id.)

Several weeks later, at the end of November, Ms. Malloy was hospitalized with a

perforated ulcer.  (Intercall's RSOF ¶ 60.)  On December 6, 2005, Ms. Paczkowski was informed

by Maribell Santiago, an Intercall Employee Relations Coordinator, that Ms. Malloy "probably

won't be able to return [to work] until February 2006."  (Dashiell Decl., Ex. B., email from Ms.

Santiago to Ms. Paczkowski, Dec. 6, 2005 (marked as Santiago Ex. 5).)  Three days after

receiving notice that Ms. Malloy's medical leave would be for an extended period of time, Ms.

Paczkowski emailed another Intercall employee, Taryn Stinson, about transferring Ms. Malloy's

accounts that were not within the territory managed by Ms. Paczkowski to the geographic areas

where the companies were located.  Ms. Paczkowski wrote:

> I have been given the go-ahead to move all of Ruthann's accounts to where they
> belong according to geography.  Once I receive the list of account, city and
> state[.]  I would love to start transitioning them immediately. Is this something
> that you can help me with?

(Chester Cert., Ex. L, email exchange between Ms. Stinson and Ms. Paczkowski, dated

December 9, 2005.)  Ms. Stinson responded, providing a list of Ms. Malloy's accounts and

identifying "the appropriate ICall rep code based on zip codes."  (<u>Id.</u>)  Ms. Packzowski

responded:

> Please see the attached.  All companies from Tab 1 should be moved ASAP!  I
> pulled off all accounts based in NJ, NY and CT (within my territory scope) and
> placed on Tab 2 – Ruthann will be keeping these accounts. . . .

(<u>Id.</u>)  As a result, Ms. Malloy's accounts, not located in NJ, NY, or CT, were transferred to other

Intercall sales managers.  (<u>See also</u> Malloy's SOF ¶ 47.)

Ms. Malloy returned from medical leave on February 17, 2006.  (<u>Id.</u> ¶ 48.)  At this time,

Ms. Pazckowski informed her that all of her accounts located outside of New York, New Jersey,

and Connecticut had been transferred.  (<u>Id.</u>)  Ms. Malloy requested that she be given a designated

geographic territory in Ms. Paczkowski's area.  In approximately September 2006, Ms. Malloy

was assigned Western Connecticut as her geographic territory.  (Intercall's Reply SOF ¶¶ 19 &

n.1, 25; Pl.'s Stmt. of Add'l Material Facts, submitted in opposition to Intercall's MSJ

[hereinafter "Malloy's Add'l SOF"] ¶ 26.)   In late 2006, Intercall assigned another person to this territory.  (Intercall's Reply SOF ¶ 26)   Intercall did not inform Ms. Malloy that it had placed another person in this territory.  (Id.)

In late November 2006, Ms. Malloy acknowledges that she was continuing to not meet the sales target numbers set by Intercall.  (Dashiell Decl., Ex. A, Malloy Dep. Tr. 431:17-432:12.)  As a result, she was given a Performance Improvement Notice ("PIN"), which required her "to improve her performance no later than February 28, 2007.  (Malloy's SOF ¶ 52; Intercall's SOF ¶ 50; Intercall's RSOF ¶ 65.)   Ms. Malloy does not dispute that she was failing to meet her targets, rather, she asserts that she was set up to fail because she was given an area that was a "joke" and numbers to call on that were "bogus." (Intercall's Reply SOF ¶ 27; Malloy's Response to Stmt. of Facts [hereinafter "Malloy's RSOF"] ¶ 16.)

On January 8, 2007, Gwen Stallins, an Intercall Employee Relations Director, sent an email to Mr. Dunne recommending that Ms. Malloy be terminated.  Ms. Stallins wrote:

> I wanted to give you a heads up [and] solicit any comments you might have on this.  Patty Paczkowski and Kim McLachlan contacted me again today concerning serious performance issues with Ruthann Malloy.  Ruthann is currently on a Step III PIN for these issues, and is showing no improvement.  I am going to recommend termination of her employment before the PIN expires.
>
> Ruthann has on occasion indicated that she would file discrimination charges . . . against us if we termed her, but I believe that we are in a good position at this time to either defeat the charges or minimize the damages based on clearly documented performance failures.  Absent any objection from you, we wish to proceed in the next day or two.  Appreciate any feedback.

(Chester Cert., Ex. K.)  Mr. Dunne responded to Ms Stallins by telling her that he "supported [her] decision on this."  (Id.)  Ms. Stallins then wrote to Ms. Paczkowski, copying Ms. McLachlan, stating: "Patty – we have the green light from Marty [Dunne] . . . ."  (Id.)  Ms.

Paczkowski thanked Ms. Stallins and told her that, before Ms. Malloy was actually terminated, Ms. Paczkowski "first need[ed] to prepare [some] documents." (Id.)

Three days after this exchange, on January 11, 2007, a Saturday Night Live clip regarding sexual harassment in the workplace was shown during a video conference presented by the Boston sales office. (Intercall's Reply SOF ¶ 40.) Ms. Malloy watched the video and claims that it was offensive to her. (Id.) She immediately complained to Ms. Paczkowski. (Intercall's SOF ¶ 54.) It is undisputed that Ms. Paczkowski responded by email, apologizing to Ms. Malloy and telling her that she would forward the complaint to Ms. McLachlan. (Id.) It is also undisputed that the manager responsible for airing the clip was reprimanded by Ms. McLachlan. (Id.)

Ms. Malloy was terminated on January 23, 2007. (Intercall's RSOF ¶ 55.) Around January 30, 2007, Ms. Malloy suffered a massive stroke. (Malloy's Add'l SOF ¶ 46.) Ms. Malloy presently claims that she was discriminated against by Intercall, that Intercall wrongfully terminated her, and that Intercall's actions caused her stroke.

## II.   LEGAL STANDARD

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party first must show that no genuine issue of material fact exists. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial. Id. at 324. The non-moving party must offer specific facts that

establish a genuine issue of material fact and may not simply rely on unsupported assertions, bare allegations, or speculation. See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999). Also, the Court must consider all facts presented and the reasonable inferences drawn from them in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

## III.     SUMMARY JUDGMENT MOTIONS

Ms. Malloy moves for partial summary judgment on her breach of contract claim. Intercall moves for summary judgment as to each of Ms. Malloy's claims: (1) breach of express and implied contract, (2) age discrimination in violation of NJLAD, (3) retaliation in violation of NJLAD, and (4) intentional infliction of emotional distress.[1]

## A.     Breach of Contract Claims

To establish a claim for breach of contract under New Jersey law, a plaintiff must show: 1) the existence of a contract, 2) a material breach of the contract by the defendant, and 3) damages resulting from the breach. See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 421 F. Supp. 2d 831, 833 (D.N.J. 2006), aff'd, 482 F.3d 247 (3d Cir. 2007). Ms. Malloy asserts that the following email exchange represents a contract between her and Intercall regarding the terms of her employment.

> Hello Patti, as indicated in our conversation today, I just wanted to outline what my impressions are of the scope of my position within the Intercall organization in general and under your direction in particular.
> 1. Ability to keep existing base of business. **YES.**
> 2. Ability to keep working existing prospects base for future close. **We will choose 10-15 of your top prospects. In addition, you will also be assigned a**

---

[1] Intercall asserts that Ms. Malloy is no longer pursuing her CEPA claim (Intercall's Summ. J. Br., at 2 n.1); Ms. Malloy did not dispute this statement in her brief.

**designated territory.**
3. Ability to retain my office in Wayne, NJ. **YES.**
4. Report to Patti Paczkowski and to report to the Parsippany Office for weekly status meetings (Thursdays). When traveling on business or during inclement weather in the winter I can call into the weekly status meeting. **YES. You will need to change your schedule a bit however . . . .**
5. While I work from home from 7:30 to 8:30 am, I will be into the office at 9 am and unless workload warrents (sic) it will leave at 5PM. **YES…our hours are 8:00-5:00 . . . .**
6. I will be permitted to continue to work as a Senior National Sales Manager . . . **. Your new title will be Senior Meeting Consultant.**
7. I have applied under West's career application. **Thank you!**
8. My salary and compensation will remain the same. **YES.**
9. Certain accounts such as ABA/ABACLE; and Southern Company's will be reviewed for possible relief. **We will review. Unable to commit on relief possibilities at this time.**

If there's anything I forgot please advise as to your consent to the above.

(Chester Cert., Ex. F, email from Plaintiff to Ms. Paczkowski, dated July 13, 2005.)  Ms. Malloy asserts that this email exchange between Ms. Paczkowski and her represents a contract between her and Intercall regarding the terms of her employment.  In particular, Ms. Malloy argues that, in the email, Intercall agreed: (1) that she could keep her existing client base; (2) that she could prospect her top accounts and farm accounts across the country, and (3) that she would be assigned a specific geographic territory.  (See Malloy's SOF ¶ 24; Malloy Opp'n, at 44.)

On the other hand, Intercall argues that the email relied on by Ms. Malloy is not an enforceable contract of employment conditions because Ms. Malloy was an at-will employee, because the terms are too vague, and because there was no consideration for any of the alleged promises.  Additionally, Intercall argues that, even if there was a contract, Ms. Malloy did not perform under it, and that she has not established any damages.

1.    <u>Existence of a Contract</u>

Ms. Malloy admits that she was an at-will employee, and that, as such, Intercall could

terminate her at any time.  (Malloy Opp'n, at 43 ("Plaintiff is an at-will employee.")

Additionally, Intercall's employee manual, which Ms. Malloy admits to reading, clearly stated

the at-will nature of her employment.  The manual reads:

> **Employment at Will**
> Your employment with Intercall is a voluntary one and is subject to termination
> by you or Intercall at will, with or without notice, at any time. Nothing in these
> policies will be interpreted to be in conflict with or to eliminate in any way the
> employment at will status of Intercall employees.
>
> This policy of employment-at-will may not be modified by any officer or
> employee and shall not be modified in any publication or document. The only
> exception to this policy is a written employment agreement approved at the
> discretion of the President or the Board of Directors, whichever is applicable.
>
> These personnel policies are not intended to be a contract of employment or a
> legal document.

(Intercall's SOF ¶ 17; Malloy's RSOF ¶ 17.)  Ms. Malloy, however, argues that this fact is

irrelevant.  She argues that, under New Jersey law,[2] at-will employees may enter contracts

governing certain aspects of the employment relationship.  She argues that the email between her

and Ms. Paczkowski, on behalf of Intercall, was just such an express contract.  She states: "The

fact that [she] was [an] at-will employee did nothing to alter the fact that the parties had an

agreement governing certain aspects of the employment relationship; nor does it alter Intercall's

---

[2] The parties both apply New Jersey law to Ms. Malloy's claims.  Although normally this Court must apply New Jersey's choice of law rules to determine what law should apply for each claim, see <u>Warriner v. Stanton</u>, 475 F.3d 497, 499-500 (3d Cir.2007), such an analysis is unnecessary where there is agreement as to the law, and there is no reason to question this choice.  Ms. Malloy's was employed by Intercall in New Jersey, and most, if not all, of the actions from which her claims arise occurred in New Jersey.

obligation to act in good faith with respect to the terms contained in the agreement." (Malloy Opp'n, at 43.)

"In New Jersey, an employer may fire an employee for good reason, bad reason, or no reason at all under the employment-at-will doctrine." Wade v. Kessler Inst., 798 A.2d 1251, 1258 (N.J. 2002). Thus, "[a]n employment relationship remains terminable at the will of either an employer or employee, unless an agreement exists that provides otherwise." Id. Here, it is undisputed that Ms. Malloy was an at-will employee; Ms. Malloy does not claim that there was a contract between her and Intercall that altered this relationship. Rather, she argues that a contract existed between her and Intercall that governed certain aspects of her employment.

The Court agrees with Ms. Malloy that, under New Jersey law, at-will employees may enter contracts with their employers regarding certain terms of their employment other than the duration of the employment. See Nolan v. Control Data Corp., 579 A.2d 1252, 1257 (N.J. Super. App. Div. 1990) (finding that the plaintiff, an at-will employee, and employer had an enforceable agreement regarding the payment of past commissions). But, for a contract to exist, the agreement must still meet the ordinary requirements for the formation of a contract. For instance, "[a] contract arises from offer and acceptance, and must be sufficiently definite so that the performance to be rendered by each party can be ascertained with reasonable certainty." Baer v. Chase, 392 F.3d 609, 618-19 (3d Cir. 2004) (alteration in original; internal quotations omitted); see also Shebar v. Sanyo Bus. Sys. Corp., 544 A.2d 377, 381 (N.J. 1988);

Intercall argues that, because Ms. Malloy was an at-will employee, it had the right to *prospectively* change the nature of her employment. It also argues that, even if it could in general be bound by contract from changing future aspects of an employee's employment, the

email at issue was too vague to create any binding obligation to Ms. Malloy.

The email at issue was exchanged on July 13, 2005. There is no dispute that, upon her transition to reporting to Ms. Paczkowski on August 1, 2005, Ms. Paczkowski did what she agreed in her email. In her motion for partial summary judgment, Ms. Malloy states:

> [Intercall] did, at least temporarily, comply with the conditions reflected in Plaintiff's July 13, 2005 email. Defendant hired Ms. Malloy as a Senior Meeting Consultant, compensated her at her previous rate of compensation, allowed her to work from the old ECI office in Wayne, New Jersey (rather than Ms. Paczkowski's office in Parsippany), and officially, albeit briefly, allowed Plaintiff to keep most of her national accounts.

(Br. in Supp. of Pl.'s Mot. for Partial Summ. J. [hereinafter "Malloy's Summ. J. Br."], at 25.) Thus, Ms. Malloy appears to be claiming that Intercall breached her "contract" by not permitting her to keep her existing client base indefinitely, by not letting her prospect her top accounts and farm accounts throughout the country, and by not giving her a designated *geographic* territory.

First, the email explicitly limits Ms. Malloy's ability to "keep working [her] existing prospects base for [the] future." Also, the email not only limits this request, but also leaves the parameters of this aspect of Ms. Malloy's employment open. Aside from any other argument, this provision is clearly too vague to form the basis of an obligation by Intercall.

With respect to Ms. Malloy's claim that Intercall agreed to assign her a specific *geographic* territory, the email does not even contain such an agreement. Instead, Ms. Paczkowski states that Ms. Malloy would be assigned a designated territory. Ms. Paczkowski testified that Ms. Malloy's designated territory was

> Q: …What was Ruthann Malloy's designated territory in October of 2005?
> A. I believe her territory at that time consisted of her accounts, her prospect accounts that she was pursuing, as well as areas that were local to my jurisdiction that I could say to her, you can go here. For example, I remember her having

account in Roseland, New Jersey, which should have fallen underneath another
one of my reps, but she had that area.
Q. Did she have a designated geographical territory in which to prospect
accounts?
A. She had her top prospects that she would have listed out, and she had her base
of business.
Q. Okay. So that's a type of territory but not a geographical territory per se?
A. Exactly.

(Intercall's SOF ¶ 16 (quoting Ms. Paczkowski's deposition).)  Ms. Malloy's actions support this

testimony.  Although she complained about various Intercall actions, she did not request a

specific *geographic* territory until March 2005, after the majority of her ECI had been transferred

to other sales associates. Additionally, Ms. Malloy's own arguments demonstrate that this

provision, even if otherwise, enforceable, is too vague to form an enforceable contractual right.

Although Ms. Malloy focuses in various places on the lack of a having a specific geographic

territory assigned, in other places she merely complains of the failure to assign a "workable"

territory.  Additionally, even if the term "designated territory" were not deemed to be too vague,

there are sufficient other boundaries around this alleged promise.  There is no indication when

such a territory must be assigned, how long she must be permitted to work the territory before, or

if, it could be changed.  Thus, the Court finds that this statement in the email also is insufficient

to create a binding obligation for Intercall.

The real dispute, however, involves the statement by Ms. Paczkowski that Ms. Malloy

would be permitted to keep her existing client base.  Because it is undisputed that Ms. Malloy

was permitted to keep her base initially, the Court presumes that Ms. Malloy's claim is that the

email created a contract which prevented Intercall from ever changing Ms. Malloy's client base.

In other words, Ms. Malloy appears to argue that this email meant that she was entitled to keep

her existing client base indefinitely regardless of any other factor.  Ms. Malloy has not cited to, and this Court cannot find, a case that has held that an employer could not *prospectively* change the terms of an at-will employee's employment.  Nolan, heavily relied on by Ms. Malloy, held that an employer could not *retroactively* change an agreement as to a term of employment compensation "at any time and for any reason whatever"; it said nothing about prospective changes to the employment.  579 A.2d at 1258.

Intercall argues had right to change Plaintiff's work conditions at any time.  It argues that it would make no sense if it could terminate Ms. Malloy's employment at any time, but could not change other aspects of her future employment based on changed circumstances.  Courts have held that, under New Jersey law, an employer's right to change the terms of an at-will employee's terms of employment "includes the right to impose new requirements on the employee."  Mita v. Chubb Computer Serv., Inc., 767 A.2d 989, 994 (N.J. Super. Ct. App. Div. 2001).  Courts in other states have reached a similar conclusion regarding at-will employees. See, e.g., Green v. Edward J. Bettinger Co., 608 F. Supp. 35, 41-42 (E.D. Pa. 1984), aff'd, 791 F.2d 917 (3rd Cir. 1986) ("The undoubted right to terminate an at-will contract necessarily includes the right to insist upon changes in the compensation arrangements as a condition of continued employment."); Cotter v. Desert Palace, Inc., 880 F.2d 1142, 1145 (9th Cir. 1989) (holding that an employee contract claim based on a change in the tip sharing policy failed because "[a]n employer privileged to terminate an employee at any time necessarily enjoys the lesser privilege of imposing prospective changes in the conditions of employment").

Intercall further argues that this is particularly true where, as here, the alleged agreement contains no duration and where the employee manual provides that the at-will nature of the

employment may not be altered except by written agreement approved by the President or Board of Directors.  See Mita, 767 A.2d at 994-95 ("Where an employee manual clearly and unequivocally provides the exclusive means by which an employment-at-will relationship can be altered, we perceive no sound jurisprudential or public policy reason prohibiting enforcement."). The Court agrees that it would not makes sense if Ms. Malloy's at-will arrangement could not be changed except by written agreement approved by the President or Board of Directors, but that severe limitations could be placed on Intercall's ability to adjust her client base indefinitely based merely on an email agreement by a local sales manager.

"Additionally, the duration of [a] contract is . . . an essential term and therefore any agreement must be sufficiently definitive to allow a court to determine the agreed upon length of the contractual relationship."  Baer, 392 F.3d at 619.  The email plainly provides no duration related to any of the alleged agreements; in fact, Ms. Malloy appears to argue that Intercall agreed to indefinitely maintain her initial working arrangement.  Thus, the Court also agrees that Ms. Malloy's argument fails because no time limit is provided in the email.

In summary, Ms. Malloy acknowledges that she initially began working for Ms. Paczkowski according to the parameters set forth in the July 13 email.  She acknowledges that she was an at-will employee.  It is also undisputed that the bulk of her non-local accounts were not transferred until December 2005, while she was out on extended medical leave.  Yet, Ms. Malloy argues that, based on the bare statements outlining a new position in the July 13 email alone, Intercall was barred from ever changing her existing client base for any reason whatsoever.  Such an argument does not have support in New Jersey law.

Because this Court finds that no contract existed between Ms. Malloy and Intercall

barring Intercall from prospectively changing the aspects of Ms. Malloy's employment, it need

not reach Intercall's other arguments related to lack of consideration, performance, or damages.

Summary judgment in favor of Intercall on Ms. Malloy's breach of contract claim is granted;

Ms. Malloy's motion for partial summary judgment on the contract claim is denied.

        2.     <u>Breach of Implied Covenant of Good Faith and Fair Dealing</u>

"In the absence of a contract, there is no implied covenant of good faith and fair dealing."

<u>Nolan</u>, 579 A.2d at 1257.  Therefore, because this Court has found that no contract existed

between Ms. Malloy and Intercall, Ms. Malloy's claim for a breach of the implied covenant of

good faith and fair dealing fails.  Summary judgment on this claim is granted in favor of

Intercall.

        3.     <u>Compensatory Damages and Worker's Compensation Bar</u>

Because this Court has granted summary judgment in favor of Intercall on Ms. Malloy's

breach of contract claims, it need not reach Intercall's additional arguments related to Ms.

Malloy may seek compensatory damages of back or front pay and whether her claim for

damages caused by her ulcer and stroke are barred by New Jersey's Worker's Compensation

Act.

    **B.**    **NJLAD Age Discrimination Claim**

Ms. Malloy alleges that, based on her age, "Dunne, McLachlan and Paczkowski

conspired over a period of two years to systematically strip [her] of her ECI accounts, transfer

those accounts to younger workers, and then terminate her."  (Am. Compl. ¶2; <u>see</u> also Malloy's

SOF ¶ 59.)  Specifically, Ms. Malloy alleges that Intercall discriminated against her in the

following ways:

1.    Transferring the majority of [her] accounts to younger, less qualified sales consultants;

2.    Requiring [her] to train the younger, less qualified sales consultants before transferring her accounts;

3.    Failing to provide Plaintiff with new accounts after Intercall acquisitions as it did all of its younger sales consultants;

4.    Failing to assist Plaintiff with managing her accounts while she was on medical leave as it had its younger sales consultants;

5.    Failing to provide Plaintiff with a designated territory, as it had its younger sales consultant;

6.    Placing [a] much younger employee in Plaintiff's territory that she was finally given in September/October of 2006;

7.    Falsely placing Plaintiff on a Performance Improvement Plan; and

8.    Falsely terminating Plaintiff for poor performance.

(Malloy's Opp'n, at 21.)  On the other hand, Intercall asserts that age was not a factor in any

employment decision related to Ms. Malloy, including those decisions related to the assignment

and handling of her accounts.

       In determining if summary judgment is appropriate for a NJLAD discrimination claim,

courts use a three step process.  "First, the plaintiff carries the burden of establishing, by a

preponderance of the evidence, the elements of a prima facie case of discrimination."  Greenberg

v. Camden County Vocational and Technical Schs.,  708 A.2d 460, 465 (N.J. Super. Ct. App.

Div. 1998) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)); Smith v. City

of Allentown, 589 F.3d 684, 691 (3d Cir. 2009).[3]  The elements comprising a prima facie case

for discrimination under NJLAD are that: "(1) plaintiff belongs to a protected class; (2) she was

performing her job at a level that met her employer's legitimate expectations; (3) she suffered an

_____

[3]  In interpreting the NJLAD, courts look to federal law, such as the Age Discrimination in Employment Act ("ADEA") for guidance. See Waldron v. SL Indus., Inc., 849 F. Supp. 996, 1000 (D.N.J.1994), rev'd on other grounds, 56 F.3d 491 (3d Cir.1995) ("Age discrimination claims under the [NJ]LAD and the ADEA are governed by the same standards."); see also Bergen Commer. Bank v. Sisler, 723 A.2d 944, 949 (N.J. 1999) (citing Waldron).

adverse employment action; and (4) others not within the protected class did not suffer similar adverse employment actions."  El-Sioufi v. St. Peter's Univ. Hosp., 887 A.2d 1170, 1182 (N.J. Super. Ct. App. Div. 2005); Sarullo v. USPS, 352 F.3d 789, 797 & n.6 (3d Cir. 2003).  In an age discrimination case, "[t]he focal question is . . . whether the claimant's *age*, in any significant way, made a difference in the treatment he was accorded by his employer."  Petrusky v. Maxfli Dunlop Sports Corp., 775 A.2d 723, 726 (N.J. Super. Ct. App. Div. 2001) (emphasis added) (internal quotations omitted).  Thus, courts interpreting the ADEA have held that an employer is not prohibited "from making an employment decision on the basis of higher salaries, increased benefits, pension status, or claims for medical expenses even though these characteristics are often correlated with an employee's age." Broaddus v. Fla. Power Corp., 145 F.3d 1283, 1287 (11th Cir.1998) (citing Hazen Paper Co. v. Biggins, 507 U.S. 604, 611 (1993)); see also Kelly v. Moser, Patterson and Sheridan, LLP, 348 Fed. Appx. 746, 749 (3d Cir. Oct. 9, 2009) (unpublished opinion) (citing Hazen).  In other words, for age discrimination cases, it is *age* discrimination alone  that is prohibited.  Broaddus, 145 F.3d at 1287 (citing Hazen, 507 U.S. at 611).

After an employee has established a prima facie case, "the burden then shifts to the employer to rebut the presumption of discrimination by either establishing the reasonableness of the otherwise discriminatory act or by articulating a legitimate, nondiscriminatory reason for the employment action." Greenberg, 708 A.2d at 465; see also Smith, 589 F.3d at 690.   If the employer is able to articulate such a reason, the plaintiff must then show that the proffered reason was a pretext for a discriminatory decision.  Smith, 589 F.3d at 690; Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 299-300 (3d Cir. 2004) (applying McDonnell Douglas framework to

NJLAD claim).   To demonstrate that the proffered reasons are pretextual, a

> plaintiff generally must submit evidence which: 1) casts sufficient doubt upon
> each of the legitimate reasons proffered by the defendant so that a factfinder could
> reasonably conclude that each reason was a fabrication; or 2) allows the factfinder
> to infer that discrimination was more likely than not a motivating or determinative
> cause of the adverse employment action.

Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994).  But, "the plaintiff cannot simply show that

the employer's decision was wrong or mistaken, since the factual dispute at issue is whether

discriminatory animus motivated the employer, not whether the employer is wise, shrewd,

prudent, or competent."  Id. at 765; see also Abramson v. William Paterson Coll., 260 F.3d 265,

283 (3d Cir. 2001); see also Silvestre v. Bell Atlantic, 973 F. Supp. 475, 483 (D.N.J. 1997) ("[A]

plaintiff's disagreement with a defendant's evaluation of his performance, or the plaintiff's own

perception of his performance, does not demonstrate pretext under the McDonnell Douglas

framework.").  Instead, "the non-moving plaintiff must demonstrate such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy

of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory

reasons."  Fuentes, 32 F.3d at 765 (alteration in original; citations and internal quotations

omitted); see also Abramson, 260 F.3d at 283; Taylor v. Amcor Flexibles, Inc., 669 F. Supp. 2d

501, 507-511 (D.N.J. 2009).

Additionally, in an age discrimination case where a plaintiff was both hired and fired

while over 40, there is a presumption against age discrimination as a motivating factor for

termination.  See Young v. Hobart West Group, 897 A.2d 1063, 1070 (N.J. Super. Ct. App. Div.

2005) ("Courts have rejected age discrimination claims when a plaintiff was both hired and fired

while a member of the protected age group."); <u>Lowe v. J.B. Hunt Transport, Inc.</u>, 963 F.2d 173,

174-75 (8th Cir.1992) ("It is simply incredible, in light of the weakness of plaintiff's evidence

otherwise, that the company officials who hired him at age fifty-one had suddenly developed an

aversion to older people less than two years later."); <u>Thomasian v. N.J. Inst. of Tech.</u>, No. 08-

2218, 2010 WL 1032653, at *5 (D.N.J. Mar. 16, 2010).  Such a presumption is particularly

appropriate where the same individuals hired and fired the plaintiff, and the lapse between the

hiring and firing is not very long.  <u>See</u> <u>Thomasian</u>, 2010 WL 1032653, at *5; <u>see also</u> <u>Proud v.</u>

<u>Stone</u>, 945 F.2d 796, 798 (4th Cir.1991).

 Here, Ms. Malloy was fifty-seven years old when she was hired.  She was hired by Mr.

Dunne, with input from Ms. McLachlan, and she was terminated approximately two years later

by Mr. Dunne.  (<u>See</u> Intercall's SOF ¶¶ 11, 55-56.)  Ms. Malloy has made no allegations that Mr.

Dunne, Ms. McLachlan, or Ms.Paczkowski ever made derogatory remarks to her about her age

or generally commented negatively about older workers.  (Intercall's SOF ¶ 68.)  Ms. Malloy has

only testified that three Intercall employees, who were not responsible for decisions about her

employment, made a few "stray remarks."  (<u>Id.</u>)  Ms. Malloy also has not disputed that, for the

two years she was working at Intercall under Ms. Paczkowski, Ms. McLachlan, and Mr. Dunne,

she was one of the highest paid sales consultants.  And, as discussed in the prior section, Ms.

Malloy does not dispute that she was an at-will employee who could have been terminated at any

time.  With this general background, the Court turns to Ms. Malloy's specific complaints.

 1. <u>Transferring of Accounts</u>

 Ms. Malloy asserts that Intercall discriminated against her by "[t]ransferring the majority

of [her] accounts to younger, less qualified sales consultants."  The key facts related to this claim

are not disputed.  It is undisputed that Intercall's general business model provides for the

servicing of accounts by the Intercall office in the region where the account is located, except for

certain national accounts which are handled by a national accounts group.  It is also undisputed

that when Ms. Malloy was retained by Intercall in July 2005 she was permitted, at least initially,

to continue servicing her accounts which were located across the country despite this being

contrary to Intercall's normal business model.  It is also undisputed that prior to the December

2005 transfer of accounts at issue that certain of Ms. Malloy's accounts were transferred to the

national accounts group or to other regional offices where the companies were located.  (See

Intercall's Summ. J. Br., at 16-17; Intercall's Summ. J. Reply, at 3 n. 3, 4.)  It is undisputed that

the majority of Ms. Malloy's accounts were transferred to younger sales associates.  But, it is

also undisputed that most sales associates at Intercall were younger than Ms. Malloy when she

was hired and when her accounts were transferred.   Even if these facts are sufficient to state a

prima facie case age discrimination case, Ms. Malloy has not submitted any evidence to support

a finding that Intercall's proffered reason for the transfer was a pretext for discrimination.

Intercall asserts that the accounts were transferred because the unique arrangement with

Ms. Malloy was not working out to its satisfaction, and because Ms. Malloy's extended medical

absence exacerbated the difficulties with maintaining her accounts from the New Jersey office.

To support her argument that these reasons are merely pretext for discrimination Ms. Malloy

primarily focuses on the timing of events and mere speculation (which is based significantly on

mischaracterizations of the evidence produced).

Ms. Malloy asserts that pretext is clear here because within ninety days of the July 13

email, Mr. Dunne "ordered" that the majority of her accounts be transferred.  (See Malloy's SOF

¶ 39.)  First, as noted in the particular statement by Ms. Malloy (other statements assert different time periods), Mr. Dunne's email was sent three months after the original agreement that Ms. Malloy could keep her existing client base.  Second, Mr. Dunne's email plainly was not ordering the transferring of Ms. Malloy's accounts on October 13, 2005.  Instead, Mr. Dunne suggested that the accounts be transferred as of January 1, 2006 and asked for comments.  Ms. Paczkowski agreed that moving the accounts made sense for the company, but asked for more time "before committing" to a transfer.  Mr. Dunne agreed to the additional time.  Regardless of whether Mr. Dunne may have wanted or thought it best that the accounts be transferred, it is undisputed that the accounts were not transferred at that time.

Before there was much of an opportunity for Ms. Paczkowski or Mr. Dunne to take further action in the ordinary course of business, Ms. Malloy went out on medical leave on November 24, 2005.  There is no evidence that the accounts were transferred at that time.  Ms. Malloy asserts, however, that the decision to move the accounts was made before Ms. Paczkowski knew that Ms. Malloy would be out for an extended period of time.  Thus, she argues, Ms. Paczkowski's stated reason that, in part, the accounts were too burdensome to manage from New Jersey while she was on leave is pretextual.  Again, this assertion is not supported by the evidence.  The evidence shows that Ms. Malloy's non-New Jersey, New York, and Connecticut accounts were transferred three days *after* Ms. Paczkowski was informed by human resources that Ms. Malloy would be out on extended medical leave.  Ms. Paczkowski testified:

> The underlying reason why the accounts were moved was that the ECI selling model did not fit with the Intercall selling model, meaning that Ruthann had wanted to hold on to her accounts regardless of location, and it was something

that was allowed for her to do, but when she had gone on leave, and I believe her leave was for an extended period of time, it became very cumbersome to manage not only a base of business in addition to my own responsibilities, but a base of business which I could not visit locally. They were all over the place, and that in hand with the fact that the accounts were under a lot of attention and a lot of scrutiny because the revenue trend was on a decline, the decision was made to move them.

(Intercall's Summ. J. Br., at 13-14.)  Ms. Malloy asserts that a transfer because of medical leave was "unusual."  She asserts that another sales consultant on Paczkowski's team had gone on medical leave, and Ms. Paczkowski managed the account in his absence.  (Intercall's SOF ¶ 66)  But, Ms. Malloy presented no evidence regarding the duration of his leave, the person's age, and the size or type of his accounts."  (Id.)  Intercall has certified that "unlike Plaintiff's accounts which were dispersed across the country, the account of the sales consultant cited in Plaintiff's example—Maersk—was headquartered in New Jersey, Paczkowski's territory."  (Id.)  In other words, Ms. Malloy has offered no evidence of someone similarly situated who was treated differently.   In fact, part of the challenge with Ms. Malloy's claims is that she initially sought and was given special treatment.  Thus, her situation was in many respects unique; she cannot now simply point to the different treatment as evidence of discrimination.

More importantly, all the evidence submitted indicates that the accounts were transferred without reference to the age of the transferee sales personnel.  Ms. Malloy simply relies on the fact that the sales personnel to whom the accounts were transferred likely were younger, because most sales associates were younger, to support her argument.  She argues that because Mr. Dunne was aware that most sales associates were younger than her, he must have known the people to whom the accounts were transferred were younger.  But, Ms. Malloy testified:

[I]t was my understanding and I may be wrong, but it was my understanding that

the way these accounts were moved, they were bundled under me. Okay. They then, Marty moved them to individual sales offices. In other words, if it was the ABA, the ABA was moved to the Chicago office because that's where their headquarters was.

(Intercall's SOF ¶ 34 (quoting Ms. Malloy's deposition).)  This statement is consistent with the emails between Ms. Paczkowski and Ms. Stinson where the "the appropriate ICall rep code [was identified] based on *zip codes*."  (Chester Cert., Ex. L (emphasis added).)   In a situation like the one presented here, where the plaintiff was hired while in a protected class and most sales associates are younger than here, and there is no other evidence indicating that age was a factor in the transfer decision, the fact that accounts were transferred to younger employees is "a rather unremarkable fact." Thomasian, 2010 WL 1032653, at *6.

This is particularly so when the evidence actually shows that Ms. McLachlan and Ms. Paczowski had an incentive to keep the accounts under their management.  Their pay was based in part on the revenue targets of the people they supervised.  (Intercall's SOF ¶ 27.)  As Ms. Paczkowski and Ms. Stinson's email exchange organizing the transfer of the accounts makes clear, the majority of the transferred accounts were outside Ms. Paczkowski and Ms. McLachlan's territory.  Thus, it harmed, not helped them, to transfer a substantial amount of work out of their area of supervision.

Ms. Malloy also asserts that she was more highly compensated than the younger sales consultants to whom the accounts were transferred, implying that Intercall transferred the accounts to avoid paying her more money.  But, as noted above, for an age discrimination claim, *age* must be the motivating factor, not other, perhaps correlative factors, such as salaries.  See Broaddus, 145 F.3d at 1287 (citing Hazen, 507 U.S. at 611).

Based on these facts, the Court finds that Ms. Malloy has not demonstrated that a genuine issue of material fact exists as to whether the decision to transfer the majority of her non-local accounts in December 2005 while she was on extended medical leave was motivated by discrimination based on her age or that it is reasonable to otherwise infer that Intercall's reasons for the transfer were pretextual.  On the contrary, the undisputed evidence indicates that age was not a factor in the decision.

    2.   <u>Training</u>

Ms. Malloy also argues that Intercall discriminated against her based on age by "requiring [her] to train the younger, less qualified sales consultants before transferring her accounts."   Ms. Malloy states that "Intercall engaged in a scheme to use Plaintiff as a resource to train its inexperienced, younger sales force."  (Malloy's Opp'n, at 23.)  Intercall asserts that the "training" was simply information sharing about accounts that were being transferred.

To support her position, Ms. Malloy cites to this Court's decision in  <u>Feruggia v. Sharp Electronics Corporation</u>, which held that a showing that a "plaintiff [was] asked to train younger replacement was evidence of age discrimination."  No. 05-5992, 2009 WL 1704262, at *5 (D.N.J. June 18, 2009).  But, Ms. Malloy misunderstands the <u>Ferrugia</u> holding.  Being required to train younger works is not in itself evidence of pretext.  In <u>Ferrugia</u>, the employer had claimed that the plaintiff's employment was terminated because his position was *redundant*.  <u>Id.</u>  In finding a fact issue on pretext, this Court noted that the fact that the plaintiff was required to train the very employee who assumed his responsibilities, was inconsistent with the employer's redundancy argument.  <u>Id.</u>

Here, Intercall transferred the accounts to the local offices where the companies being

serviced were located, in line with its clear business model.  The fact that it asked Ms. Malloy to provide information to the new sales personnel servicing those accounts in order for them to understand the account's service history and operation does nothing to undercut its proffered reason for the transfer.  Intercall stated its belief, consistent with it general business model, that the accounts could be better serviced by local representatives.  It wanted those representatives to have past information about the accounts.  Ms. Malloy has offered no evidence that employees in similar situations, who have had accounts transferred to other sales personnel, were not required to share account information with the new sales personnel servicing the account.  (See Intercall's SOF ¶ 65.)

      3.     <u>Failure to Provide New Acquisition Accounts</u>

Ms. Malloy next argues that Intercall discriminated against her based on age because Ms. Paczkowski did not assign her any of the new acquisition accounts in October 2005.  It is undisputed that all of the other sales personnel under Ms. Paczkowski, except Ms. Malloy, received something from the acquisitions.  It is also undisputed that all of the other sales consultants who reported to Ms. Paczkowski at that time were younger that Ms. Malloy.  However, Ms. Packzowki has stated that she did not give Ms. Malloy any of the acquisition accounts because of the size and nature of her revenue base and her belief that Ms. Malloy needed to focus on growing those accounts.

Ms. Malloy argues that she has presented evidence of pretext, pointing to Mr. Dunne's October 2005 email.  She argues that at the time Ms. Paczkowski assigned the new accounts, "Intercall had already determined that it was going to transfer the majority (ultimately 78%) of Plaintiff's accounts."  (Malloy's Opp'n, at 25.)  Thus, Ms Malloy argues that Ms. Paczkowski's

reason that she believed Ms. Malloy had a large revenue base and need to focus on growing those accounts is implausible, and, therefore, an inference of *age* discrimination is proper. The Court disagrees. As noted above, Mr. Dunne plainly did not direct the transfer of Ms. Malloy's accounts in October 2005. And, Ms. Paczkowski specifically requested additional time to see how the accounts performed before committing to any transfer, which was agreed to by Mr. Dunne. Thus, at the time Ms. Paczkowski made the decision to not assign Ms. Malloy any of the new accounts, the evidence supports, not contradicts her proffered reason.

Finally, Ms. Malloy has not presented any evidence that a younger person with a similar size and type (national servicing required) of revenue base would have been given additional accounts. As noted above, there was no one similarly situated because Ms. Malloy had specifically requested to be treated differently than other employees.

4.   Designated Territory

Ms. Malloy argues that she was not assigned a "territory" until long after she was hired, that the territory she was ultimately assigned was "bogus," and that another, younger sales personnel was also placed in her territory without her knowledge. She asserts that all of these actions were the result of discrimination based on her age. It is undisputed that "most of the other sales consultants on [Ms.] Paczkowski's sales team were assigned geographic territories." (Intercall's Reply SOF ¶ 24.) It is also undisputed that Ms. Malloy was not assigned a *geographic* territory until September 2006, when she was assigned Western Connecticut. It is further undisputed that Intercall assigned another sales associate to this region in late 2006.

As Intercall notes, Ms. Malloy cannot have it both ways. After she began working under Ms. Paczkowski, Ms. Malloy was not assigned a geographic territory because she requested and

was allowed to retain the majority of her ECI account base which was located throughout the country.  It is undisputed that this base of business was large.  Thus, it was Ms. Malloy's choice not to be initially assigned a *geographic* territory.  Additionally, Intercall has presented evidence that, while all personnel had some type of territory, it was not always a designated *geographic* territory.  Ms. Paczkowski testified that one member of her team, "Robyn Louridas, was not assigned a geographic territory but instead was assigned a list of accounts."  (Id. (citing Ms. Paczkowski's deposition).)

It is also undisputed that Ms. Malloy could not have immediately been assigned a geographic territory in place of her ECI accounts that were transferred in December 2005.  She was out of the office at that time on medical leave and did not return until mid-February 2006.  And, Ms. Malloy admits that "by the time she requested a geographic territory in March 2006, most territories had been assigned to other members of the team."  (Intercall's SOF, ¶47.)

Ms. Malloy was assigned a geographic territory in September 2005.  Her claim that the territory was "bogus" is not supported by any evidence other than her broad statements that the telephone numbers she was given to prospect were a "joke."  (Malloy Opp'n, at 29.)  Such a claim is actually undermined by the undisputed fact that Intercall assigned another person to the territory later in the year.  Additionally, Ms. Malloy also has not submitted any evidence that placement of the other sales associate in her territory interfered with her ability to generate business.  In fact, she testified that she was not even aware that another person was operating in the territory; their paths only crossed at a holiday party, not out in the field.

Also, although Ms. Malloy asserts that assigning another person to her territory supports her discrimination claim, she has provided no evidence that territories are always serviced only

by one Intercall sales personnel.  In fact, Ms. Paczkowski testified that two sales consultants

were assigned to South Jersey.  (Intercall's Reply SOF ¶ 24 (citing Ms. Paczkowski's

deposition).)  Mr. Dunne also testified that, while generally one sales consultant is responsible

for generating revenue within a specific geographic territory, there have been exceptions made

"when the market isn't being well covered with territory activity or when no revenue is being

generated."  (Intercall's SOF ¶ 48 (quoting Dunne's deposition).)  In short, Ms. Malloy has

submitted no evidence whatsoever that age played any role in these decisions.

5.    PIN and Termination

Finally, Ms. Malloy argues that Intercall discriminated against her by placing her on a

PIN and, then, terminating her.  Ms. Malloy does not argue that younger people with her

performance would not have been put on a PIN or that younger employees with her performance

would not have been terminated.  Rather, she argues that Intercall's discrimination against her in

the handling of her accounts put her in a position which ensured her poor performance.  Thus,

Ms. Malloy's arguments related to the PIN and termination are inter-related with her other

allegations of discrimination.  Because the Court has already found that Ms. Malloy has failed to

establish that Intercall's proffered reasons regarding its actions related to her accounts were pre-

textual for discrimination, it also finds that Ms. Malloy has failed to establish that Intercall

placed her on a PIN and terminated her for discriminatory reasons.

Intercall argues that Ms. Malloy's claim does not make sense.  It states:

[T]o believe Plaintiff's theory, one must assume that Dunne, McLachlan and
Paczkowski hired Plaintiff for her large account base, paid Plaintiff one of the
highest salaries for sales consultants at Intercall for almost two years and then
stripped Plaintiff of her accounts [while she out on extended and unexpected
medical leave] and transferred them to younger workers, all with the intent of

ultimately terminating Plaintiff's employment, and all because of her age. (Intercall's Summ J. Br., at 25.) The Court agrees with Intercall that Ms. Malloy's theory is unsupported by the evidence; she has not come forward with evidence creating a genuine issue of material fact that she was discriminated by Intercall because of her *age*. As noted at the beginning of this section, Ms. Malloy was retained by Mr. Dunne to work for Intercall when she was fifty-seven years old. Despite being an at-will employee who could be terminated at any time, Intercall employed her at a high salary for two years. Ultimately, it was Mr. Dunne who also terminated her.

Ms. Malloy has simply presented no evidence, beyond her speculation, that *age* played any role in the decisions leading up to her PIN and termination. Such a basis is insufficient to raise a question of pretext. The evidence before the Court is to the contrary. This is not to say that Intercall's decisions were sound or reasonable. But, that is not an evaluation the Court has engaged in or must make. The inquiry is simply whether there is any evidence from which a fact finder could determine that Intercall's decisions were based on Ms. Malloy's *age* and not some other factor. The Court finds that there is not. For these reasons, the Court grants Intercall's motion for summary judgment for Ms. Malloy's NJLAD age discrimination claim.

### C.    Retaliation

On January 11, 2007, a Saturday Night Live video clip about sexual harassment was broadcast by Intercall's Boston sales office via video conference. Ms. Malloy watched the video on her computer. She found it in appropriate and offensive. She complained to Ms. Paczkowski about the video. About two weeks later, on January 23, 2007, Ms. Malloy was terminated. Ms. Malloy claims that she was terminated in retaliation for her complaint. (Am. Compl. ¶ 49-53.)

NJLAD makes it unlawful "[f]or any person to take reprisals against [another] person because that person has opposed any practices or acts forbidden under [the NJLAD] . . . ." N.J. Stat. Ann. § 10:5-12(d).   In order to set forth a prima facie case of unlawful retaliation under the NJLAD, a plaintiff "must show: (1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action."  Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001).   Intercall argues that Ms. Malloy's retaliation claim fails because she has not established a causal connection between her January 11, 2007 complaint and her termination.  Intercall asserts that the decision to terminate Ms. Malloy's employment was made prior to the January 11 airing of the video clip.

The parties spend a substantial amount of time disputing whether the *final* decision to terminate Ms. Malloy was made on January 8, prior to broadcast of the video, or after the broadcast.  The Court finds that this dispute is not central to resolving Ms. Malloy's retaliation claim; even if the final decision to terminate Ms. Malloy was made after January 11, she has still failed to establish a causal link between her complaint and her termination.  For this claim, she must come forward with some evidence that her termination was related to her *complaint*.

It is undisputed that McLachlan contacted human resources in October 2006 to see if Ms. Malloy could be part of an upcoming reduction in force.  (Intercall's Reply, at 8 n.10.)  It is also undisputed that Intercall put Ms. Malloy on a PIN in late November 2006.  It is further undisputed that on January 8, 2007 Mr. Dunne, who ultimately was responsible for terminating Plaintiff, agreed with the recommendation from human resources that she be terminated. Whether or not Ms. Paczkowski wanted to give Ms. Malloy more time to improve, Mr. Dunne

Page 32 of 36

had agreed on January 8 that Ms. Malloy could be terminated.

Additionally, Ms. Malloy has not submitted any evidence that Intercall responded negatively to her complaint. Ms. Paczkowski responded immediately to the complaint and apologized to Plaintiff, and the manager responsible for broadcasting the clip was reprimanded. Thus, Plaintiff has pointed to no facts supporting her claim that she was terminated in retaliation for her complaint other than merely pointing to the fact that she complained and was terminated approximately two weeks later.

"[T]he mere fact that [an] adverse employment action occurs after [the protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir.1997)). Thus, "[o]nly where the facts of the particular case are so 'unusually suggestive of retaliatory motive' may temporal proximity, on its own, support an inference of causation." Young, 897 A.2d 1063, 1073 (N.J. Supp. App. Div. 2005) (quoting Krouse). Where temporal proximity is not unusually suggestive, a plaintiff must establish the causal link through other evidence. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-81 (3d Cir. 2000). Here, given all the surrounding circumstances, the timing of the termination is not "unusually suggestive of a retaliatory motive." Other than the fact that her actual termination occurred after broadcast of the video, there are no facts to suggest that the termination was related to her complaint. Intercall's motion for summary judgment for Plaintiff's retaliation claim is granted.

## D.    Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress ("IIED"), a plaintiff

must establish intentional and outrageous conduct by the defendant, proximate cause, and

distress that is severe.  See Buckley v. Trenton Saving Fund Soc., 544 A.2d 857, 863 (1988).

The Third Circuit has stated: "It is extremely rare to find conduct in the employment context that

will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of

intentional infliction of emotional distress."  Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d

Cir. 1988); see also Bishop, 864 F. Supp 416, 427 (D.N.J. 1994)(stating that the conduct must be

"so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.").  At

the summary judgment stage, if a plaintiff fails to make a sufficient showing regarding an

essential element of her case upon which he or she will bear the burden of proof at trial,

summary judgment must be granted.  Thus, a court must determine if the conduct complained of

is sufficiently extreme and outrageous to allow it to go to a jury.

In Cox, the defendant terminated the plaintiff's employment the day he returned from

work following triple bypass surgery.  The Third Circuit found that the defendant knew that

plaintiff's recovery was incomplete, knew that plaintiff's medical and disability benefits may be

affected, likely knew that the termination "endanger[ed] his chances of collecting medical and

disability benefits" and likely knew that the termination would hurt his chances of finding

alternative employment.  861 F.2d at 395.  Nevertheless, the Cox court held that, even if

defendant dismissed the plaintiff with an improper motive, its actions did "not appear to rise to

the level of outrageousness" required.  Id. at 396.

On the other hand, in Leang v. Jersey City Board of Education, relied on by Ms. Malloy,

the New Jersey Supreme Court permitted an IIED claim to go to the jury where a teacher

Page 34 of 36

submitted facts supporting her claim that her employer publicly humiliated her.  969 A.2d 1097,

1115 (N.J. 2009).  In Leang, the plaintiff was a Cambodian who had suffered under government

authorities prior to coming to the United States.  Her employer was aware of this and of her

resulting fear of governmental authorities.  Id. Her employer was also aware of her non-violent

beliefs.  Id.  Ms. Leang alleged that in revenge for rejecting sexual advances of a co-worker, she

was falsely accused of threatening the lives of her students, arrested, led from the school by the

authorities, and treated in a publicly humiliating manner designed to take advantage of her fear

of government authorities.  Id. at 1104, 1115.  The court held that this conduct was sufficiently

outrageous to proceed to the jury.

> Here, Ms. Malloy summarizes her IIED claim as:
>
> Plaintiff has alleged and demonstrated that Intercall's outrageous conduct was a
> continuous pattern, which included the following: treating Plaintiff differently
> than the other younger members of the sales force by only providing them with
> assistance, territories and new acquisition accounts; not providing Plaintiff with
> adequate means of monitoring her accounts, systematically stripping Plaintiff of
> her multi-million dollar accounts; in engaging in a scheme to use Plaintiff as a
> resource and humiliating her by requiring her to train its inexperienced, younger
> sales force; simultaneously and surreptitiously assigning a consultant in Plaintiff's
> bogus territory; wrongfully placing Plaintiff on probation for a contrived "failure
> to perform" and wrongfully terminating Plaintiff for her alleged "failure to
> perform."

(Malloy's Opp'n, at 40.)  Ms. Malloy essentially complains of how her work was assigned and

managed.  She has not even alleged that any derogatory remarks were made to her.  The Court

disagrees with her that Intercall's conduct is comparable to that in Leang, where the plaintiff

claimed she was set up to be falsely arrested and publicly humiliated and terrified.  The conduct

identified by Ms. Malloy above describes, perhaps, an unpleasant working environment; it does

not "rise to the level of outrageousness" required.  If such allegations were sufficient to survive

summary judgment, every employee who had been passed over for promotion or who was given

work that they did not like or felt was beneath them would have a triable IIED claim.  IIED

claims, however, are for exceptional conduct that stands outside the "bounds of decency."

Intercall's motion for summary judgment as to this claim is granted.

**IV.    OTHER MOTIONS**

Intercall also presently moves to strike Ms. Malloy's experts, Dr. Crain and Dr. Levison.

Because the found has found that summary judgment in favor of Intercall is appropriate

regardless of the causation and damage calculation issues addressed by these experts, resolution

of these motions is unnecessary.  They are denied as moot.

**V.    CONCLUSION**

For the reasons set forth above, Ms. Malloy's motion for partial summary judgment on

her breach of contract claim is denied.  Intercall's motion for summary judgment on all claims is

granted.  An appropriate Order accompanies this Opinion.


/s/ Jose L. Linares

DATE: December 28, 2010                      JOSE L. LINARES,
                                             UNITED STATES DISTRICT JUDGE